Charles Bennett on behalf of William Grant, as he is the Chapter 7 trustee of the various debtor estates under the joint caption of the United States International Bank. I would like to request three minutes. Surely. Thank you. This matter arises from a decision by the Bankruptcy Court to dismiss Mr. Grant's complaint against various selling shareholders who received proceeds as a result of a leveraged buyout. The Court dismissed the complaint finding three bases, but the principal basis was that the transaction was exempt pursuant to Section 546B of the Bankruptcy Court. Didn't your hill get a lot steeper with the Sixth Circuit and Eighth Circuit's decisions this year in that regard? Yes, Your Honor. I do have two more circuits. I have two circuits that are against me, and I do have this circuit's resorts opinion, which other courts have certainly interpreted to be much broader than I would ask this court to interpret. So, what's your response to the analysis given in the contemporary industries in the in-break QSI cases, other than they're wrong? Why are they wrong? I think they're wrong, Your Honor, because the context of the language that you find is, first, the context that you find the language in. If you start with 546E itself and look at the language and look at the words that are used in 546E, it's clear that they're discussing about transfers to or for the benefit that go through commodities, brokers, stockbrokers, financial institutions. And then they talk in the context of a settlement payment, and that leads you to two definitions. We all agree that the general definitional sections that appear under Section 101 of the Bankruptcy Code don't apply. They then take us to Section 541 of the Bankruptcy Code. Section 541 of the Bankruptcy Code arises under a specific section of the Bankruptcy Code. It's not a general section. It's a specific section. It's a very specialized section. It's a section that deals with the liquidation of stockbrokers. So, if you begin with that context, that the definition that you're being referred to is being found in a section that deals with a specialized area of the Bankruptcy Code, and that area happens to be the liquidation of stockbrokers, the public markets. And then you go to the definition itself under 741, and you find the words as commonly used in securities trade. And we refer to you the question of that language in and of itself as a modifier of settlement payments, which would conclude the plain language that it has to be a publicly traded security. In our resorts case, we said that – I mean, we recognize that there were two competing interests coming together, but we said there's a very broad definition to be dealt with here when it comes to looking at the specific sections you're looking at and telling us, though, give it a narrow look, right? No, Your Honor. I don't think I'm telling you to give a narrow look. You can give it a broad look in the securities market. Was the transaction at issue one that it commonly rose in the public securities market? You don't need to give it necessarily – that's not necessarily a narrow look, but it's fitting it within the public markets for which the section itself arises. Of course, our resorts case involved publicly traded situation. It did, Your Honor. And as a result, that's why I think it's certainly not controlling with respect to the specific matter before you, and I'm not asking you in any way to reverse resorts. I'm asking you to clarify or to limit the application of resorts. But as has been mentioned, the language was very broad, and more recent cases certainly have taken that and specified that it applies to private areas as well. Yes, Your Honor. There are cases which held that the application of that language applies both to public and private transactions. There are also other cases, not necessarily circuit court, but other cases, both in the bankruptcy court and district court cases, which have come up with a different conclusion with respect to the plain language and how you interpret – how you read the plain language of Section 741, Section 8 on the definition of – But in this circuit, the courts have said it doesn't – it's not limited to public markets, right? In this circuit, the lower courts following what they interpret resorts to have said, said it's not limited to public markets. But again, it's the lower courts following interpretation, I think, of an overly broad and expansive reading of resorts. This case – this court has stated on various occasions that if the matter is not before it, even if the matter – even if the court may comment on it, that does not mean that the court is deciding that issue. The court may have commented on it, but the issue of whether or not this exemption should apply to public – I mean, to private transactions was not decided by the court. What's the reason for the distinction between public and private transactions to withdraw? Maybe a good reason. Well, the reason is that if one goes to the legislative history, which I understand that the court does not go to unless there's an ambiguity, but if one goes to the legislative history in this case, it is clear that when Congress was enacting the exemption, they were acting it to protect the publicly traded markets and to the ramifications and difficulties that a bankruptcy could have in the context of a publicly traded regulated security. The concern was – is that a trustee in bankruptcy would bring an action against one party seeking to make a recovery. That party may have received billions of dollars and then distributed those billions of dollars out to other parties who would have in turn distributed those out to other parties under the publicly regulated procedures. If the court allowed you to recover that payment, you would then have a waterfall of various litigations down that would have ended up chasing the General Motors case, maybe hundreds of thousands of individuals. So the question was – for Congress was when they had the two clashes of the two policies, they decided to carve out a narrow exception to protect the publicly traded markets. Now, you say they decided to carve out the narrow exception. I don't want to loop back and necessarily have you repeat, but what is it in the language of 546E that leads you to say it's a narrow exception? I mean, when we looked at it in resorts and we looked at 546 and we looked at the definition, the statutory definition of settlement payment, we said it's extremely broad. And so evidently it wasn't apparent then, although it was being argued in the context of a publicly traded securities transaction, that this was limited language and it was My question – I'm sorry, let me be more precise. Is there something in the language of 546E that you can point to that says, well, that means it's limited to publicly traded markets? Not within the specific language, though. There are certainly words within 546E which would indicate that was the intent. As I said, the basic lead-in to who is not – who is being protected. It's the commodities brokers, it's the commodity merchants, it's stock brokers. It's that class of people, all of which we deal in the public arena. But more importantly, under that, it's – under 546E, when it uses the word settlement payment, it says as defined in. And that refers you back to section 101, which we already said doesn't apply. And then the 741. And it's within the context of 741 that we find the limitation on 546E because it's commonly used in securities trade. The bankruptcy code recognizes a fraudulent transfer law based on – a fraudulent transfer claim based on state law. It has its own fraudulent transfer claim, doesn't it? Yes, it does. But the 546 applies to both types of claims. That is correct. But it's interesting because when I thought about that, it occurred to me that if the transaction arose in a context other than bankruptcy, the same claim might be subject to a fraudulent transfer action. In other words, this arose in bankruptcy, so section 546E became an issue in the case. But suppose you had a bankruptcy – not a bankruptcy, excuse me – just a fraudulent transfer claim not in a bankruptcy context on the same facts. Could it then be said, well, there's no defense then? Certainly, Your Honor. Under the state law, there is no 546E. So if a creditor brought a fraudulent advance claim, say in this case against the REC entity, and then sought to reach back and claw back the payments, whether it would be successful or not as a matter of fact, I don't know. But that's a different issue. It would not be protected by 546E. So you might get a different result depending upon the context of the case. I suppose, Your Honor, that the – I haven't gone through – I haven't thought this all the way through, but I suppose it would have been possible for the trustee in bank – no, it would not have been possible for a trustee in bankruptcy to bring the claim in the state court. It still would have been bound by it. No, but if there was no bankruptcy, sometimes there are fraudulent transfer cases that don't arise at all in a bankruptcy context. This could have been a straight state law claim. That's correct. And there would have been no 546E exception that I know of. What about your claims under the Delaware Code? We came under – that was – we used 544 of the Bankruptcy Code, which then allowed us to act as either hypothetical or actual creditor and look to the state law claims. So we brought the claims under the Delaware Fraudulent Advance Act. But our power – the trustee's power to do so is under Section 544, which unfortunately is subject to 546E. Sure. So what you've done is – what the Bankruptcy Code has done, in effect, is incorporated a defense to a state claim. Yes. In a sense. It has, Your Honor, yes. It prohibits the trustee from pursuing various claims, one of which would be a state-based fraudulent advance claim. So if the 546E non-recoverable provision kicks in, your Delaware Uniform Fraudulent Transfer Act claims are blocked? That's correct, Your Honor. That was, in fact, the finding of the Bankruptcy Court. They were blocked. The reading of the two circuits – and if this Court would interpret, this applied to would be to in substance exempt all leveraged buyout – would protect all shareholders who participate in a leveraged buyout under any circumstances. Now, let's for just a minute assume, if that's all right with the Chief, since we're past the time, if I may ask a further question. Assume that we agreed with you that 546E only applies to the publicly traded markets and that your state claims were things that you could pursue. Can you explain what kind of knowledge has to be imputed to the players in this? Is it enough to say, oh, well, they knew that in the end this was all going to result in that did result, that is, Placine International would be a holding company, would have all these entities operating under it? Or do you have to demonstrate and allege that the shareholders, the transferees here, that they were somehow aware that there was going to be an insolvency or a problem associated with that? I don't believe I have to establish they had knowledge that there would be an insolvency. What I have to establish is they participated in the transaction, which was – and you have to distinguish here. There actually were a series of transactions. Maybe the pleading should have been a little bit clearer, and I apologize for that. I suppose I can always clarify the pleadings on a motion to amend. But there was a series of transactions, and I think the easiest one for the court to look at in order to analyze the matter that's before it is the Rex transaction, because in that transaction you had Placine, or basically Rex, borrowing in excess of $40 million and assuming $60, $70 million more of debt, so taking on almost $100 million worth of debt, of which they then, whatever proceeds came in from that loan came into Rex, flowed immediately out of Rex to the selling shareholders, all of which was set forth in a funds flow memo of which the selling shareholders were a party to. And more importantly, in Rex, you basically only had one shareholder. You had BA Capital, who received $25 or $26 million of the total of $31 million. The balance was spread out between Heller Financial for $1.5, and then some officers and directors, some additional monies. But that's the classic example of a leveraged buyout. There was no question that the target company takes on all the debt and receives none of the benefits. You know what I wondered when I looked at this? I thought to myself, suppose you have a corporation that's got lots and lots of unsecured debt, and the sellers of the corporation sell the assets and take back liens on the assets to cover the payment for themselves. In effect, what they've done is that they've deprived the unsecured creditors of the benefits of those assets to pay them. That's exactly the claim that the trustee raises here, is the assets, instead of going in the order of priority they should have gone, which is secured, unsecured, equity, the unsecured basically got... You know, I haven't practiced law in 38 years, but I used to see in very small private transactions precisely that structure. Somebody would sell a bar, and then he would take back a lien on the assets. You know, he would get a down payment and then payments, and there would be creditors. And I used to wonder, gee, I wonder... But it never blew up. But that's in effect what the sellers can do by doing this is that they can, if I may use the term, stiff the creditors. The net result here, Your Honor, is that a substantial premium gets paid to the equity, and ultimately it's on the back of the unsecured creditors, the burden of all the debt to pay the equity. Good. Mr. Bennett, thank you very much. Ms. Wagner, good morning. Good morning, Your Honors. Karen Wagner of the Furman Davis Book and Board of Wealth for B.A. Capital Corporation. Your Honors, if I may, with the Court's permission, I will address the 546E issue, and my colleague Mr. Fleming will be addressing the other issues in this case. Fine. On 546E, Your Honors, there's not a great deal to say, I think, given your resorts decision and the other decisions in the recent decisions in other circuits. But why should a, and you just heard the question I asked, why should the sellers, in effect, be able, simply because it was a private, where you don't have this great morass, I understand, of public, why should they be able to do this and, in effect, say to the seller, it's tough, we're leaving with the assets. Is that right? Well, Your Honor, first of all, I guess I would suggest that that's not exactly what happened here. Here, what appears to have happened is that a company had an idea about putting together a lot of different packaging companies. They put them together, they operated for a good period of time, and then they went bankrupt for other reasons. So I don't think the fact situation is quite consistent. Well, were there unsecured creditors at the time of the transactions? There must have been, Your Honor. Who didn't get paid? There must have been, Your Honor. Is that right? I mean, I don't know. Your Honor, there hasn't been any discovery or anything in this case because we've been doing this on motion. But shouldn't they have a chance to? I don't know. It troubled me. That was odd. That doesn't mean that resorts doesn't buy this panel. That's a different issue. But I can see a distinction. Your Honor, I think resorts does, in fact, govern in this situation. And I think it governs because it is a situation that involves the sale of securities. But it's a case, as Chief Judge Scharick has said, where it was decided in a publicly traded market setting. And the setup for the language that you folks lean heavily on is the resort court's observation that we're dealing with the intersection of securities law issues and bankruptcy law issues. And the security law issues that they appear to have been concerned about are the ones that trustees described. Publicly traded markets and how could you possibly allow people to go back and bring things in in a widely diffused market like that. Something completely different than a single shareholder kind of transaction like the Rex one where your client is involved. I mean, that seems to be a distinction with a real difference. Why is that one that we shouldn't pay attention to? Your Honor, I'll give you two answers to that. One is because under resorts, you followed the plain meaning rule. And under the plain meaning rule, you have to look at what the statute says. And the statute just does not have any kind of exception in it for securities that are not distributed through the clearing system. The second answer I would give you is that the statute is also intended to protect the financial system, not just the securities clearing system. You do have to have a transfer through a financial institution, which is what happened here. And I would respectfully suggest that is also an issue here. You wouldn't want, because some entity goes bankrupt, you wouldn't want then to have a ripple effect through the financial and banking systems trying to get back amounts that were I can understand that. But in this case, it really got bad because each of the entities guaranteed all the debts of all of them. So the creditors were really worked over. Your Honor, again, I would respectfully suggest that it didn't work out, apparently. We've not had any discovery. But I don't think it was apparent at the time these transactions were undertaken when a economies of scale, I don't think it's apparent that it was not going to work out. But in any event, I would respectfully suggest that because it certainly isn't a leveraged buyout context, I would suggest that the resorts case does control, that 546E does have a policy that is served in this context. But whether it did or it didn't, the language is very clear. It's very broad. Your Honor, this court made the resource decision 10 years ago. And many other courts have rested their views on it. And I would respectfully suggest it is now settled law, which is entirely rational and which Congress appears to have no difficulty with. And I believe it controls here. I wondered about that, too. You know, I don't know that it makes much difference. But has any effort been made to get Congress to limit this or Congress has just accepted it? Your Honor, I don't know exactly what efforts have been made, but I can tell you that in 2007, Congress did add to this provision. And they made it even more broad than it is now, than it was, I'm sorry, when we were litigating this case. The provisions we are speaking about now were not changed, but an additional provision was put in that made it even more broad that said that any transaction through a financial institution in connection with a securities contract is immune from avoidance. But did you hear my question? I'm sure you heard it. I'm sure you heard the answer. You might get a different result in a state court, in a state law fraudulent transfer transaction than you would get in a bankruptcy context. It's quite true, Your Honor, that this is a federal statute that affects federal bankruptcy situations and that does not affect non-bankruptcy situations. But I would again suggest to you that the balance Congress struck here makes sense. They were trying to protect the financial and security systems, so they made immune a large number of transactions that involved securities and financial institutions. But they did exclude from the coverage any intentional fraudulent conveyance that occurs within two years of a bankruptcy. So it's not an unlimited protection. There is an exclusion. And so I would suggest, as this Court has already held, that it's an entirely rational statute. Both the Bankruptcy Court and the District Court felt bound by our decision in resorts, which, as we've noted, did not involve privately traded, a private transaction. But if we did not have that, I mean, how would you look at the disputed language in 741-8 or other similar payment commonly used in the securities trade? Your Honor, this Court and other courts have said that a settlement payment of this type is simply a payment of cash through the financial institution for securities. It's a very, very, very broad definition. And therefore, I think, regardless of the resorts decision, the language is very broad. It would certainly cover the situation here. And in resorts, in fact, although the securities were of a public company, the transaction was not effected through the public securities markets, and the clearing functions were not implicated, which is often the case with leveraged buyouts. So I would suggest, Your Honor, that given the fact that the logic of this decision is based on the plain meaning of the words, that the words are very, very broad, and they would certainly cover the transaction that occurred here. Okay. Any other questions? I don't have anything else. Thank you very much. Thank you, Your Honor. Mr. Fleming? Good morning, Chief Judge Sirica, and may it please the Court. Mark Fleming on behalf of the former shareholders of Key Packaging Industries. I'd like to start, if I may, I'd fully join in what Ms. Wagner said about Section 546E, but I'd like to address Chief Judge Sirica's question at the very end about if resorts had not been on the books, how would the Court approach that particular inquiry? I'd make three points in that regard. The first is that Congress is able to distinguish between publicly traded and privately held securities when it wishes to. We cite a number of provisions on page 21 of our brief where Congress specifically references private securities offerings and publicly traded securities. If Congress had wished to make such a distinction here, it clearly could have. The second point is that Section 546E specifically talks about transfers by or to a forward contract merchant, and that is something that Mr. Bennett skipped over when he was summarizing the parties addressed in that section. Forward contracts always occur outside of a publicly regulated market. The Fifth Circuit made that clear in the Olympic natural gas case, and I don't think that's disputed. So it's clear that settlement payment must refer, at least, to private forward contract transactions, and there's no reason to think then that Congress implicitly included some kind of limitation on transactions to or from financial institutions so that they would only be publicly traded transactions. In fact, Mr. Bennett makes much of the word trade in 741, talking about the securities trade, but Congress also used the word trade in referring to the forward contract trade. That's in Section 10151A of the Code. And to use Mr. Bennett's interpretation, that would then be an oxymoron because trade would be something, in his view, that's restricted to publicly traded or public transactions on a public exchange. Rest forward contracts are not. Isn't it true that your clients, in effect, were able to use the assets of the various corporations to their own benefit to the detriment of the unsecured creditors of the corporations? Absolutely not, Judge Greenberg, and that is a very important question, and it goes to the question that Judge Jordan asked earlier about knowledge and the allegations in the complaint regarding knowledge. I think in your hypothetical. I didn't mean necessarily with knowledge, but that that was the consequence of it. Well, Judge Greenberg, in your hypothetical, where the sellers of the company effectively become their own, they issue a mortgage to the resulting company so that they have a lien that they retain, then there would be evidence, or at least an allegation, that the sellers were proceeding with knowledge of how the funds were being originated, that they came from debt that they themselves were giving. And a lot of these cases, including this Court's decision in Tabor Court Realty, involve a situation where the lender is aware of where the funds are going and how they will be used. And in that circumstance, the idea of collapsing the different transactions makes a lot of sense. But here, there is no allegation of knowledge, awareness, or intent, which every court to have addressed this issue has said is the dividing line in terms of determining whether to collapse the transactions. So your case is different than the hypothetical I gave. Absolutely, Judge. Not a little cooperation where everybody knew exactly what the buyer was going to do. That is certainly, that's absolutely right, Your Honor. You can search this complaint in vain for any allegation of knowledge, awareness, or intent as to where the funds were coming from. I mean, a bit of background might be useful here, Judge Greenberg. My clients, the key packaging shareholders, owned a family-owned business in Salem, New Hampshire. Most of them were in their 70s and 80s. They wanted to retire. They negotiated with this company, Placine, that was interested in buying them out. They sold their stock. Fleet Bank wired a payment of the purchase price to them. Now, it seems that it now appears from the complaint that at the same time, there was Plastical in South Carolina, Marshall Plastics in Michigan, Knorr Baker in Canada, which is not a part of this case, Transamerican in California, and closed on their transaction at the same time. But there's no allegation that my clients had any knowledge that those transactions were going on or that the other shareholders had any knowledge that these separate transactions were happening. How did there end up being a provision that the assets of all would be pledged? Was that something that the shareholders were unaware of? There's no allegation in the complaint that the shareholders were aware of that, Your Honor. My best understanding is that it's something that Placine and the venture capitalists who stood behind it and presumably Placine's lenders orchestrated for their own business purposes. There was certainly a bigger – pardon, Judge Greenberg. I was just to finish my answer to the question. There was certainly no allegation that my clients or the other January target companies were aware that Placine was going to take on an additional company, Rex, seven months later, August 2000, and then load their own companies, Key, Marshall, Plastical, down with even further debt as a result of that transaction. There couldn't have been any knowledge of that because it hadn't yet happened. So you're saying that as far as your clients knew, not that they did know this, but as far as they knew, this was being financed out of fresh capital. That's certainly consistent with the allegations in the complaint, Judge Greenberg, either fresh capital as an equity investment. In fact, paragraph 36 of the complaint expressly says that the venture capitalists invested, I believe, $20 million. They got Series A convertible shares in the Placine company, Placine Packaging Corporation, for a fresh investment, or it's possible that Placine had cash in a bank account. There's no allegation they had any knowledge or awareness of where the money came from. That's critical. What was the theory of the fraudulent transfer, then, with respect to your clients? Why would your clients have been the possible participants in the fraudulent transfer? As a matter of fact, the complaint failed, didn't it, for an alternative reason, that it wasn't adequately pled? This is precisely what we're talking about, Judge Greenberg. The theory of fraudulent conveyance was one that failed to state a claim. That's because under Delaware law, the trustee is required to plead two things, a transfer by a debtor and that that transfer rendered the debtor insolvent or left it with unreasonably small assets for its business. The transfer in these cases came from Placine Packaging Corporation, but there is no allegation that that transfer or any transfer from Placine Packaging resulted in an insolvency. The allegations of insolvency are all against the target companies, and there's no allegation that any of the target companies made a transfer to any of the shareholders. So under your theory, we could affirm this case without even citing these words. Not only could you, I hardly embrace such an outcome. I think this court could affirm on the basis of both arguments, just as Judge Farnan did in the district court. But certainly the Delaware state law point that Judge Gross and Judge Farnan relied on is independently and adequately sufficient to affirm. I think this court can and should affirm on both bases. But if the court doesn't want to reach resorts, that is certainly open to the court. So then for the appellant to get a reversal, it's got to show that the district court was wrong on both bases. That is absolutely right, Judge Greenberg, and I don't think that's disputed. The trustee is appealing both grounds, and his theory on the state law ground is that the payment by Placine and the assumption of debt by the target companies should be collapsed into one. And this court's decision in Tabor and every other decision that the trustee cites, we could go through each decision on page 46 of his brief, and every single one of them requires at least an allegation of knowledge. I think the best example of that is the Weebold Storrs case from the Northern District of Illinois, and this is, just to be clear, this is the decision from 1988, not the 1991 decision that talks about 546E. But the decision that talks about collapsing refuses to collapse the transaction as to certain selling shareholders, the so-called Schedule A shareholders, because they did not have any knowledge of how the overall deal was structured. It's on page 503 of the Weebold opinion from 1988, and it could have been written exactly for this case. If the decision was made on the basis of the state law, should the trustee have been given a chance to replete? He never asked for leave to replete, Your Honor. I think it's hard to reverse Judge Gross on the theory that he didn't sua sponte, amend the complaint where the trustee had never asked. To this day, even in his briefs in this court, he didn't ask for leave to replete. Presumably, this is a sophisticated trustee represented by sophisticated counsel. If there had been a good faith basis to allege knowledge or intent or awareness, presumably we would have heard about it by now. Of course, there was no point in asking for leave to replete because of the 546. It wouldn't have helped him anyhow. It wouldn't have affected the result, but certainly it would have made clear that at least that particular basis for the bankruptcy court's decision could have been cured. But I think that the fact that that has never been suggested, all the way up through the district court and the briefing in this court. Well, nobody's going to ask to replete in order to state a theory that in itself has to end up losing any waste. One would think so, Judge Greenberg. Unless the court has any further questions, I thank the court for its attention. Thank you, Mr. Fleming. Mr. Bennett? With respect to knowledge and with respect to repleting, first of all, given the decision of both the district court and the bankruptcy court under 546E, if I had moved to amend my complaint, I still would have faced the objection that it would have been a futile exercise because it was blocked by 546E. So I did not move to amend for that reason. I would point out in the appendix beginning at page 159, which is the funds flow memorandum that relates to the Rex transaction, and that was the one where BA Capital was the principal recipient. On the issue of knowledge, that funds flow memorandum has among the various signatories of BA Capital. So at least with respect to BA Capital, the funds flow memo would establish that they had knowledge of the exact nature of the transaction. That memo spells out exactly what the transaction is going to be, the incurrence of the subordinated debt, and how the borrowing parties are going to flow into the selling shareholders. Which raises the question again of what is the character of the knowledge you have to allege. You seem to be asserting that the character of the knowledge that can result in the collapsing of the transaction is knowing the end structure of the entity, not knowing anything about risk of insolvency, not knowing anything about the amount of capital necessary to carry on, but just knowing that the end of the transaction is going to look like X is enough. Is that, in fact, your position? All that's necessary is to look at the facts of the transaction itself. In other words, if you take the company Rex as the plaintiff, that's the simplest case, takes Rex as the plaintiff, the trustee in Rex says there was a transaction. As a result of that transaction, the debt of Rex incurs $100 million worth of liabilities. And some of those liabilities, the subordinated debt portion, $40 million, gets transferred immediately to the selling shareholders, none of which benefits Rex. That is a fraudulent conveyance because there was no adequate consideration extended to Rex to incur that debt. Is the structure of the deal here different than a typical LBL? No, Your Honor. With Placine being the entity that's receiving and transferring things as opposed to the operating companies underneath it? No, particularly with Rex but also with the other entities, it's a classic LBL. Your opponents are arguing that you never asserted that Placine was a debtor in this adversary complaint for purposes recognizing that the word debtor means something in a bankruptcy context and it means another thing in a fraudulent conveyance context. Speaking about it in terms of fraudulent conveyance, you've never asserted, they say, that Placine Packaging or Placine International, I know there's some dispute about name change, et cetera, but taking it for a moment that it's the same regardless of what name you want to put on it, that you never said, hey, that's a debtor in the context of these allegedly fraudulent conveyances and, therefore, this is different than the usual LBL. I think that's your pitch. What's your response? Well, actually, Your Honor, I think it's probably a misreading of the complaint. What the complaint says is that the plaintiff is Mr. Brandt as he is the trustee of these various estates. It names all the debtors' estates. So each separate debtor, Rex, Marshall, Keith, each of those debtors was making the claim for recovery. So it's not necessarily Placine International. The plaintiff of the case was Mr. Brandt as he was the trustee of each one of those individual debtor estates, and each transaction was spelled out within the complaint itself. So you have to look at each one of the specific transactions that each debtor would have been entitled to make that recovery through Mr. Brandt. Okay. Anything else? Mr. Bennett, thank you very much. The case was very well argued. We will take the matter under advisement.